# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JORGE MOLINA, GONZALO
GUTIERREZ, RAPHAEL H. MENDEZ,
LEONARDO T. GUTIERREZ, CARLOS A.
PRECIADO, ADRIANA ARANGO,
JULIAN PRECIADO & NHORA
PATRICIA VARGAS and all others
similarly situated,

                 **Plaintiffs,**

-vs-                              **Case No.  6:05-cv-742-Orl-31DAB**

SOUTH FLORIDA EXPRESS BANKSERV,
INC.,

                 **Defendant.**

_____

# ORDER

The Plaintiffs in this case have sued the Defendant, South Florida Express Bankserv, Inc.

("SFEBI") claiming that they are owed unpaid minimum wages as well as unpaid overtime wages

under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the "FLSA") for work performed

while in the Defendant's employ.[1]  This matter is presently before the Court on SFEBI's Motion

for Summary Judgment (Doc. 37), and the Plaintiffs' Response thereto (Doc. 63).

I.      **Background**

A. The Parties

SFEBI operates a courier service, and provides to its customers drivers who make

scheduled pick-ups and deliveries.  SFEBI's headquarters are located in Miami, and it maintains

_____

[1] The Plaintiffs no longer perform work for SFEBI.  (Doc. 38 at 2; Doc. 40, Att. 1 at 2; Doc. 41 at 2; Doc. 42 at 2; Doc. 47, Att. 1 at 3; Doc. 48, Att. 1 at 4; Doc. 49 at 2).

operational hubs around the state of Florida.  These hubs are not "offices," but are simply locations

for drivers to drop off and distribute mail.  SFEBI does not maintain an office in Orlando.  Instead,

SFEBI employs a supervisor who works at a customer location as a liaison with the customer, and

monitors the drivers' work to ensure that it matches the schedules set by the customer.  SFEBI

operates on a "scheduled route basis," and provides round-the-clock service every day of the week.

B. Facts

The primary nature of the work in which the Plaintiffs were involved was "proof work,"

wherein the Plaintiffs would pick up checks that had been deposited with SFEBI's bank customers

and deliver those checks to the customer's main branch.  (Doc. 49 at 3).  The Plaintiffs also

delivered other documents such as loan documents, deposit slips, non-negotiable securities, and

inter-office mail between the customers' respective branch offices.  (*Id.* at 4; Doc. 51, Att. 1 at 1-

2).

SFEBI originally classified its drivers as employees.  These employee drivers used

SFEBI's vehicles to perform their work, and SFEBI paid for their fuel, insurance, and all related

expenses.  Employee drivers were paid based on an hourly rate.  In the mid-1990's, SFEBI

reclassified drivers as independent contractors.  The Plaintiffs thus entered into an "Independent

Contractor Agreement," which specifically stated that the relationship between SFEBI and the

Plaintiffs was that of an independent contractor, and further stated that the Plaintiffs would "in no

way and for no purpose . . . be considered an agent, servant, employee, partner or co-venturer" of

SFEBI.  (Doc. 39, Att. 2 at 3-4).[2]  That agreement also included language noting that SFEBI

---

[2] The Plaintiffs agree that they were told that the nature of their relationship with SFEBI was that of an independent contractor.  (Doc. 40, Att. 1 at 8; Doc. 41, Att. 1 at 2-3; Doc. 47, Att. 1 at 11; Doc. 48, Att. 1 at 2; Doc. 49 at 9).

acknowledged that it had no right to direct or control the means by which the Plaintiffs performed their services, and that SFEBI was only concerned with the results accomplished by the Plaintiffs. (*Id*. at 4).  The agreement did not prohibit the Plaintiffs from performing work for other businesses during those times that the Plaintiffs were not supposed to be working for SFEBI.  (*Id*. at 10; *see also* Doc. 38, Att. 17; Doc. 40, Att. 1 at 14-15; Doc. 41, Att. 1 at 11; Doc. 42 at 8).  Either party could terminate the Agreement at any time by giving the other party written notice twenty-four hours in advance.  (Doc. 39, Att. 2 at 11).

The Plaintiffs were paid based on the type of route to which they were assigned, generally based on the number of stops.[3]  (Doc. 38 at 12-13; Doc. 39, Att. 2 at 5; Doc. 40, Att. 1 at 11; Doc. 43 at 13-14; Doc. 48, Att. 1 at 2).  SFEBI determines the value of the various routes.[4]  (Doc. 40, Att. 1 at 12).  Generally, if the route change, thus requiring a driver to work more, that driver is able to earn more money.  (Doc. 41, Att. 1 at 4; Doc. 42 at 7-8; Doc. 48, Att. 1 at 7, 8; Doc. 49 at 5).  In addition, if a driver is assigned to a route in addition to that driver's regular route, that

---

[3] Drivers are paid a "commission" for their routes, based on the rate assigned by SFEBI to that route multiplied by the number of times a driver covers a particular route.  (Doc. 38, Att. 2 at 5; Doc. 43 at 13-14).  The amount SFEBI charges its customers for particular routes is set by a contract between SFEBI and its customers.  (Doc. 43 at 16; Doc. 51, Att. 2 at 3).  SFEBI then determines how much drivers will be compensated for covering those routes.  (Doc. 46 at 13).

[4] There is a dispute as to whether the Plaintiffs were able to negotiate how much they would be paid for the various routes.  The Plaintiffs assert that they were not able to negotiate the amount they were compensated, (*see* Doc. 42 at 14; Doc. 47, Att. 1 at 14; Doc. 49 at 5, 11), whereas SFEBI asserts that the compensation for routes was sometimes negotiable, (Doc. 43 at 14; Doc. 46 at 5).  The Plaintiffs assert that, particularly when they were given additional routes, they were simply given an assignment without knowing how much they would be paid, and only upon receiving their paycheck some time later could they determine how much they had been compensated for that additional route.  (Doc. 47, Att. 1 at 14; Doc. 49 at 5, 11).  It appears clear, however, that at least the initial compensation for a route is set by SFEBI.  (Doc. 46 at 13).  SFEBI asserts that the drivers are aware in advance of the compensation for additional work.  (*Id*. at 5).

driver earns extra compensation.[5]  (Doc. 38 at 13; Doc. 40, Att. 1 at 13; Doc. 41, Att. 1 at 8, 9;

Doc. 42 at 7; Doc. 46 at 5; Doc. 47, Att. 1 at 7; Doc. 49 at 11).  Drivers could increase their

compensation by reducing their individual expenses.  (Doc. 42 at 8; Doc. 48, Att. 1 at 8; Doc. 49 at

15-16).

When a driver is assigned to a route, the driver is told when to be at each stop along that

route, and which roads to take when performing that route.[6]  (Doc. 39 at 19-20; Doc. 40, Att. 1 at

15 (noting that drivers had no discretion to use different roads); Doc. 42 at 13; Doc. 47, Att. 1 at

12; Doc. 48, Att. 1 at 9; Doc. 49 at 18).  Drivers are given "route sheets" or "manifests," which list

the name of each stop and the time the driver is required to be there,[7] (Doc. 40, Att. 1 at 3, 15;

Doc. 41, Att. 1 at 5; Doc. 45 at 10), and thus drivers are scheduled to be at certain places at certain

times each day of the week.[8]  (Doc. 40, Att. 1 at 11; Doc. 45 at 19; Doc. 46 at 4).  Drivers are also

told where to enter certain buildings, where to go, and which people to speak with.  (Doc. 40, Att.

---

[5] Conversely, if a driver is unable to cover part or all of a particular route, that driver's compensation is reduced accordingly.  (Doc. 42 at 7; Doc. 48, Att. 1 at 8).

[6] Drivers were trained on their routes by the person who had covered that route before them. (Doc. 38 at 7; Doc. 40, Att. 1 at 15; Doc. 41, Att. 1 at 4).  SFEBI's "Manual of Operations" states that it is the responsibility of the driver to learn the route, that SFEBI will not compensate the drivers for the time they spend in training, and that at the customer's request SFEBI will provide a representative for up to two days to oversee the driver's performance and answer any questions.  (Doc. 39, Att. 2 at 29).

[7] These route sheets or manifests create tight schedules for the drivers to follow.  (Doc. 45 at 10).  SFEBI asserts that the drivers agree in advance to follow these manifests, and are told of the compensation for the route, as well as the nature of the route and the required times in advance.  (Doc. 43 at 9).

[8] SFEBI agrees that drivers are required to be at certain places at certain times, but asserts that the manifests are "contracts of time" that SFEBI has with its customers, and thus that the customers mandate these schedules, not SFEBI, because the drivers are delivering time-sensitive documents and thus have to precisely follow the manifests.  (Doc. 38 at 18; Doc. 43 at 9-10, 16).

1 at 15; Doc. 47, Att. 1 at 12).  While the Plaintiffs were out on their routes, they were contacted

frequently via radio by their supervisor, who would ask them questions such as where they were,

how long it would take them to get somewhere else, or would tell them to change routes to do

things such as make additional pick-ups.[9]  (Doc. 39 at 18, 20; Doc. 40, Att. 1 at 3; Doc. 45 at 8-9;

Doc. 49 at 18).  The supervisors would also urge the Plaintiffs to complete their routes faster.

(Doc. 49 at 6, 19).

 The Plaintiffs assert that they were unable to choose the route to which they were assigned,

nor were they able to request new routes;[10] instead, SFEBI assigned them to certain routes.[11]  (Doc.

40, Att. 1 at 13; Doc. 42 at 14; Doc. 45 at 19; Doc. 49 at 17).  The Plaintiffs also assert that they

did not have the ability to reject assignments given to them in addition to their normal routes, and

that if they attempted to reject this new or additional work, they would get fired.[12]  (Doc. 38 at 13;

Doc. 40, Att. 1 at 13; Doc. 47, Att. 1 at 14; Doc. 48, Att. 1 at 7; Doc. 49 at 17).  The Plaintiffs

were unable to pick which days of the week to work,[13] and were unable to take days off,

_____

 [9] SFEBI denies that supervisors constantly call drivers to check up on them, and asserts that
the only usual contact between supervisors and drivers is when drivers call in because they are unable
to meet the prescribed schedule.  (Doc. 43 at 8).

 [10] SFEBI asserts that if there is more than one route available, the driver can pick which route
to perform, but if there is only one available route, the driver can choose to accept or decline that
route.  (Doc. 43 at 11).

 [11] The Plaintiffs also assert that they were occasionally required to cover routes for other
drivers, for which they were not compensated.  (Doc. 47, Att. 1 at 15; Doc. 49 at 10-11, 19).

 [12] SFEBI disputes this assertion, and states that not only were the Plaintiffs not ordered to take
additional assignments, but the Plaintiffs had the ability to decline new routes or additional work, and
that they would not be fired if they did so.  (Doc. 43 at 11, 14; Doc. 46 at 5).

 [13] SFEBI asserts that drivers can accept routes for only certain days of the week.  (Doc. 43 at
19).

particularly when there was no one available to cover their routes.  (Doc. 40, Att. 1 at 16; Doc. 42 at 14; Doc. 47, Att. 1 at 14; Doc. 49 at 17, 21).

The Plaintiffs also assert that if they were unable to perform their own route, they could not pick a person to replace them.  (Doc. 38 at 15; Doc. 45 at 38-39; Doc. 48, Att. 1 at 9; Doc. 49 at 18).  Further, although the language of the Independent Contractor Agreement states that drivers can hire other drivers to work for them,[14] the actual practice at SFEBI forbids this procedure.[15] (Doc. 38 at 16; Doc. 40, Att. 1 at 10; Doc. 47, Att. 1 at 14-15; Doc. 49 at 18).

Often, if SFEBI needed an extra driver, supervisors would call the Plaintiffs' family and friends to cover a route.  (Doc. 49 at 11).  SFEBI would then pay that person directly, instead of paying the Plaintiff and having the Plaintiff compensate that person appropriately for covering the Plaintiff's route.[16]  (Doc. 39 at 14; Doc. 42 at 9-10, 12; Doc. 47, Att. 1 at 6; Doc. 49 at 12).

---

[14] The Independent Contractor Agreement contains a section entitled "Replacement Operator," which provides, in relevant part:

> If someone other than [the Plaintiff] operates the vehicle when [the Plaintiff] is supposed to be performing services for [SFEBI], [the Plaintiff] must notify [SFEBI] in advance of who such replacement operator will be and any such individual operator must be an employee, agent, or servant of [the Plaintiff].  Such notification to [SFEBI] is required to enable [SFEBI] to notify its customers of any such change.

Doc. 39, Att. 2 at 6.  The Agreement also states that SFEBI was not responsible for the direction and control of persons hired by the drivers.  (*Id*. at 4).

[15] SFEBI disputes this assertion, and states that drivers are permitted to hire other drivers to cover their routes and, in fact, at least one driver did so.  (Doc. 46 at 10).  SFEBI also states that drivers do not need approval from SFEBI to hire other drivers to cover their routes.  (*Id*. at 11).

[16] SFEBI asserts that if a driver has someone cover their route, SFEBI pays the original driver, and then that driver compensates the person who covered their route.  (Doc. 41, Att. 1 at 14).

-6-

The Plaintiffs were responsible for a variety of expenses, including: leasing a cellular phone from SFEBI, (Doc. 41, Att. 1 at 4; Doc. 45 at 11; Doc. 46 at 4); paying for automobile and cargo insurance, (Doc. 41, Att. 1 at 4; Doc. 42 at 5; Doc. 47, Att. 1 at 10; Doc. 49 at 5); buying uniform shirts, (Doc. 41, Att. 1 at 4; Doc. 42 at 5; Doc. 46 at 4); and paying for tolls, gas, vehicle repairs and maintenance.  (Doc. 39, Att. 2 at 9; Doc. 40, Att. 1 at 9; Doc. 41, Att. 1 at 12; Doc. 42 at 5, 7; Doc. 46 at 3; Doc. 47, Att. 1 at 11-12; Doc. 48, Att. 1 at 6; Doc. 49 at 14).[17]  SFEBI did not provide the Plaintiffs with annual leave, vacation, or a health care plan, and did not fund Workers Compensation or unemployment compensation benefits.  (Doc. 39, Att. 2 at 6; Doc. 40, Att. 1 at 10, 13; Doc. 41, Att. 1 at 11; Doc. 46 at 6; Doc. 48, Att. 1 at 6, 9; Doc. 49 at 14-15).  SFEBI did not withhold taxes from the Plaintiffs' paychecks, because the Plaintiffs were paid as independent contractors.  (Doc. 38 at 10-11, 15; Doc. 39, Att. 2 at 6; Doc. 41, Att. 1 at 11).  Prior to starting work with SFEBI, the Plaintiffs obtained and paid for driving history reports and criminal background checks.  (Doc. 42 at 5; Doc. 47, Att. 1 at 11).

There is a dispute over the amount of discretion and independence the Plaintiffs were able to exercise.  The Plaintiffs assert that they had no independence, and that they simply had to follow orders.  (Doc. 49 at 20).  SFEBI asserts that any strict requirements are instituted not by SFEBI, but by SFEBI's customers, who dictate certain requirements via contracts between SFEBI and the customer.[18]  (Doc. 43 at 16).  These contractual requirements include specified routes with a

---

[17] The Plaintiffs used their own vehicles when working for SFEBI.  (Doc. 39, Att. 2 at 6-7; Doc. 46 at 3).

[18] These requirements include, for example, that drivers wear uniforms and badges, and that drivers be present at certain locations at particular times.  (Doc. 43 at 16).  Various Plaintiffs have indicated that they are not familiar with the requirements SFEBI's customers imposed on SFEBI, and do not know whether any daily changes to their routes were made at the behest of SFEBI's customers.  (Doc. 48, Att. 1 at 9; Doc. 49 at 6-7, 20-21).

specific order of stops to be made according to a specific schedule, and that drivers wear uniforms and badges.  The prices paid for routes and stops are also governed by the contracts.  (*Id.*; *see also* Doc. 41, Att. 1 at 13).  SFEBI also notes that drivers are not told where to buy gas, get their vehicles repaired or where to park their vehicles when not in use.  (Doc. 42 at 8).  In addition, drivers are not required to display SFEBI's name on their vehicle, do not attend regular meetings, and do not receive annual reviews.  (Doc. 40, Att. 1 at 16; Doc. 41, Att. 1 at 13; Doc. 42 at 9).

C. Claims and Arguments

The Plaintiffs assert two claims against SFEBI, for violations of the minimum wage requirements (Count I) and the overtime wage requirements (Count II) of the FLSA.  SFEBI argues that the Plaintiffs were independent contractors, not employees, and therefore not subject to the provisions of the FLSA.

## II.    Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and

citation omitted).  Thereafter, summary judgment is mandated against the non-moving party who

fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25;

*Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely

on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors

Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting

facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th

Cir. 1976).[19]

The Court must consider all inferences drawn from the underlying facts in a light most

favorable to the party opposing the motion, and resolve all reasonable doubts against the moving

party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the

nonmovant's factual characterizations and legal arguments.  *Beal*, 20 F.3d at 458-59.  If material

issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed

to trial.  *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

**III.  Legal Analysis**

A. The Fair Labor Standards Act

The FLSA was enacted to eliminate low wages and long hours, and to "free commerce

from the interferences arising from production of goods under conditions that were detrimental to

the health and well-being of workers."  *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1310

---

[19] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

(5th Cir. 1976) (internal citation and quotation omitted).  The Act thus imposes a minimum wage requirement for covered employees, and "prohibits employers from employing any worker for a workweek longer than forty hours unless the employee receives compensation for the excess hours at a rate not less than one and one half times the regular rate at which the worker is employed." *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1318 (S.D. Fla. 2001) (*citing* 29 U.S.C. §§ 206, 207(a)(1)).  The first question is thus whether a person is considered an "employee" entitled to protection under the FLSA, which is a question of law.  *Id.*

The FLSA does not specifically define the limits of the employee-employer relationship, and instead only offers a vague definition of the term "employee."  *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947); *Santelices*, 147 F. Supp. 2d at 1318.  Under the Act, an "employee" is one who is "employed," and "employ" is defined as "to suffer or permit to work." *Usery*, 527 F.2d at 1311 (*citing* 29 U.S.C. §§ 203(e), (g)).   Because the FLSA is a remedial statute, courts apply an expansive definition of "employee."  *Rutherford Food*, 331 U.S. at 728; *Usery*, 527 F.2d at 1311; *see also Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1348 (M.D. Fla. 1997) (noting that "employment is defined with striking breadth," and that the "suffer or permit to work standard . . . has been called the broadest definition [of employee] that has ever been included in one act.") (internal citations and quotations omitted).

This case calls for the Court to distinguish between an "employee" and an "independent contractor."[20]  The courts have rejected the common law concepts of those terms as determinants

---

[20] One court has differentiated between employees and independent contractors as follows:

"Employees" work for wages or salaries under direct supervision.  "Independent contractors" undertake to do a job for a price, decide how the work will be done,

of who is protected under the FLSA.  *Usery*, 527 F.2d at 1311.  Further, the label the parties put on

the relationship is not determinative, nor is it relevant whether the parties intended to create an

employment relationship.  *Rutherford Food*, 331 U.S. at 729; *Donovan v. Tehco, Inc.*, 642 F.2d

141, 143 (5th Cir. 1981); *Santelices*, 147 F. Supp. 2d at 1319.  Instead, to determine employee

status under the FLSA, courts

> focus on whether the alleged employee, as a matter of economic reality, is
> economically dependent upon the business to which he or she renders his or her
> services.  In other words, [the courts'] task is to determine whether the individual
> is, as a matter of economic reality, in business for himself or herself.

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998); *see also*

*Donovan*, 642 F.2d at 143 ("The focal inquiry in the characterization process is thus whether the

individual is or is not, as a matter of economic fact, in business for himself."); *Harrell*, 992 F.

Supp. at 1348.[21]

This "economic reality" or "economic dependence" inquiry involves a number of factors,

including

_____

> usually hire others to do the work, and depend for their income not upon wages, but
> upon the difference between what they pay for goods, materials, and labor and what
> they receive for the end result, that is, upon profits.

*N.L.R.B. v. Assoc'd Diamond Cabs, Inc.*, 702 F.2d 912, 919 (11th Cir. 1983).  *See also McGuiggan
v. C.P.C. Int'l, Inc.*, 84 F. Supp. 2d 470, 479-80 (S.D.N.Y. 2000) ("In short, if the Plaintiffs were in
business for themselves, they were not employees; If they were economically dependent on and within
the direct control of CPC, they were employees.").

[21] *See Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1318 (S.D. Fla. 2001) ("The
touchstone of 'economic reality' in analyzing a possible employee/employer relationship for purposes
of the FLSA is dependency.  The courts look at all of the surrounding circumstances of the 'whole
activity' to determine whether the putative employee is economically dependent upon the alleged
employer.").

> the degree of control exercised by the alleged employer; the extent of the relative investments of the worker and the alleged employer; the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; the skill and initiative required in performing the job; and the permanency of the relationship.

*Herman*, 161 F.3d at 303; *see also Donovan*, 642 F.2d at 143; *Usery*, 527 F.2d at 1312.[22]  No one isolated factor is determinative; instead, courts look to the "circumstances of the whole activity." *Rutherford Food*, 331 U.S. at 730; *Herman*, 161 F.3d at 303.  These factors are used to gauge the degree to which the alleged employee is dependent upon the business with which he or she is connected, because dependence is the primary indicator of employee status.[23]  *Usery*, 527 F.2d at 1311.  Ultimately,

> the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA (sic) or are sufficiently independent to lie outside of its ambit.

*Id*. at 1311-12.  This "dependency" question may be broken down into two factors: "(1) how specialized the nature of the work is, and (2) whether the individual is in business for himself." *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 265 n.3 (5th Cir. 1987) (internal citation and quotation omitted); *see also Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 302 (5th Cir. 1975) ("The concept has also been put in terms of whether the individual is in business for himself.") (internal citation and quotation omitted).

---

[22] Some courts add a sixth factor, that of "the degree to which the alleged employee's tasks are integral to the employer's business." *Harrell*, 992 F. Supp. at 1348; *see also Santelices*, 147 F. Supp. 2d at 1319.

[23] *See Harrell*, 992 F. Supp. at 1348 ("These factors are used because they are indicators of economic dependence . . . . The weight of each factor depends on the light it sheds on the alleged employee's dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case.") (internal citation, quotation and punctuation omitted).

B. Analysis

*1) Degree of control by SFEBI*

SFEBI makes a number of arguments that it alleges support its position that the Plaintiffs

were independent contractors, including that: (1) it had minimal control over the Plaintiffs, and

that under the Independent Contractor Agreement, SFEBI had no right to exercise control over the

manner in which the Plaintiffs worked; (2) any monitoring it did was done at the behest of its

customers, who require strict compliance with the terms of the contracts between SFEBI and its

customers;[24] (3) the Plaintiffs could choose how much and when to work, and could accept or

reject additional routes; (4) the Plaintiffs could hire their own employees, and the Plaintiffs' work

was sometimes performed by their relatives or friends, who the Plaintiffs then paid out of their

own compensation; and (5) requirements such as the wearing of uniforms and/or identification

badges are imposed by the customer, not by SFEBI.[25]

The Plaintiffs, on the other hand, have offered evidence showing that: (1) they were

assigned to particular routes, which they were unable to choose, negotiate or reject; (2) they were

given detailed instructions concerning these routes, including what roads to take and what times to

be at certain locations; (3) they were frequently monitored via radio and were urged to complete

---

[24] The Defendant's reasoning is circular.  Any employer's business is, in essence, directed by the needs of its customers.

[25] SFEBI thus makes a number arguments about what the Plaintiffs *could* have done.  The fact that the Plaintiffs could do certain things, however, is not determinative, as "it is only what activity that [the individuals] actually engaged in that is of any consideration." *Halferty*, 821 F.2d at 266; *see also Usery*, 527 F.2d at 1312 ("It is not significant how one could have acted under the contract terms. The controlling economic realities are reflected by the way one actually acts.") (internal quotation omitted).

their routes faster; (4) they could not request or decline additional work; (5) they could not pick

their own replacements; (6) they were unable to hire drivers to work for them; and (7) that they

simply followed orders.  "Control is only significant when it shows an individual exerts such a

control over a meaningful part of the business that she stands as a separate economic entity."

*Usery*, 527 F.2d at 1312-13.  The Plaintiffs have offered sufficient evidence to create an issue of

fact as to whether they actually were able to exert control over a meaningful part of their work, and

thus the Court is unable to make a final determination on this issue.[26]

*2) Relative investments*

SFEBI argues that: (1) the Plaintiffs were solely responsible for the capital investment in

their vehicles and equipment; (2) Plaintiffs were responsible for their own expenses; (3) Plaintiffs

were responsible for their own taxes; and (4) SFEBI has a relatively small investment in the central

Florida area in that it had no offices, only one employee, and did not own the vehicles the

Plaintiffs used.  The Plaintiffs point out that a car is an essential vehicle in most households, and

---

[26] The fact that the contracts identified the Plaintiffs as independent contractors, and that their taxes were handled as if they were independent contractors has little relevance.  *Baker v. Barnard Constr. Co., Inc.*, 860 F. Supp. 766, 772 (D.N.M. 1994) ("An employee is not permitted to waive employee status.").  This is particularly true in this case, where the Plaintiffs did not have the ability to negotiate whether they would be treated as independent contractors, and were identified as independent contractors on their tax forms as a result of SFEBI's non-negotiable policy. *Id*. at 772-73; *see also Rutherford Food*, 331 U.S. at 729 (label the parties put on the relationship is not determinative); *Mednick*, 508 F.2d at 302-303 ("It is clear beyond peradventure that the parties' attempt to fasten a name of 'independent contractor' or 'employment' to their relationship by their own agreement - or, worse, where one party imposes a name on the other - will avail them little in ascertaining what the relationship is for purposes of the F.L.S.A. or similar legislation. . . . An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the F.L.S.A., by granting him some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have him operate.").

the Court notes a lack of evidence suggesting that the Plaintiffs purchased their cars for the primary purpose of their work for SFEBI. *See Herman*, 161 F.3d at 304 (noting that investment in a vehicle is "somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes"). Neither side has offered evidence demonstrating the relative investments made by either party in relation to the business at hand.[27] Accordingly, because the Court cannot make accurate comparisons of the investments made by the parties, the Court is unable to make a determination on this factor.

### 3) Opportunity for profit and loss

SFEBI asserts that (1) the Plaintiffs were paid on a commission basis; (2) the amount the Plaintiffs earned was determined by their ability to accept or reject additional work, and by their skill and ability in performing their tasks; and (3) the Plaintiffs assumed the risk of loss to the equipment and managed their own operating expenses.

In contrast, the evidence from the Plaintiffs suggests that the Plaintiffs actually were unable to request additional work in order to make more money, and instead additional work was assigned to them and they often had to wait for more than a week to discover how much additional money they made as a result.[28] SFEBI argues that the Plaintiffs had the ability to lower their costs, such as by decreasing the gas they used by purchasing a more fuel-efficient car. While theoretically

---

[27] Julian Preciado estimates that he spent approximately $820 per month on gas, insurance and vehicle repairs, and $30 per month for his radio/phone. (Doc. 38 at 9; Doc. 39 at 11). Nhora Vargas estimates that she spent $650 per month on gas and insurance. (Doc. 40, Att. 1 at 9). Presumably, these amounts approximate the expenditures by each Plaintiff, but the depositions do not make this clear.

[28] Because it appears that SFEBI controlled the primary determining factor governing whether the Plaintiffs could increase their earnings -- the ability to perform additional work -- these facts indicate that the Plaintiffs were employees, not independent contractors. *See Usery*, 527 F.2d at 1313.

possible, there is little to no evidence demonstrating that the Plaintiffs actually were able to (or in fact did) reduce their costs through any means.  Moreover, any such cost reduction would likely be *de minimus* in relation to the overall "cost" of providing the service.  Finally, the fact that an individual could request more work or re-negotiate his or her compensation is not indicative of independent contractor status, because any employee can do those things as well.  *Halferty*, 821 F.2d at 266.  The Court finds that there is a dispute as to material issues of fact on this element, and thus makes no determination at this time.

 *4) Skill and initiative required*

 A lack of specialization indicates that an individual is an employee, not an independent contractor.  *Halferty*, 821 F.2d at 267; *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311, 324 (S.D.N.Y. 2001).  Further, "[r]outine work which requires industry and efficiency is not indicative of independence and nonemployee status."  *Usery*, 527 F.2d at 1314.  Finally, even if an individual has specialized skills, that is not indicative of independent contractor status where the individual does not use those skills in an independent fashion.  *Baker*, 860 F. Supp. at 776.

 SFEBI argues that the Plaintiffs: (1) needed additional skills beyond simply the ability to drive; (2) had managerial control over their expenses; (3) could negotiate for higher commissions and hire agents to cover their routes; and (4) could take on additional responsibilities.

 As the Plaintiffs point out, it appears that they had little opportunity to exercise any skill other than the ability to pilot their vehicles swiftly and safely along their routes.  They received little to no training directly from SFEBI, and instead were given brief instructions by the driver who had previously covered that route.  They were given detailed manifests listing routes to be followed and specific times at which they had to arrive at specific locations.  Further, they were

told what roads to use, and had no discretion to try other means of serving their routes.  Finally, the Plaintiffs have offered evidence suggesting that they were unable to request additional work or to choose more lucrative routes, thus indicating a lack of ability to exercise initiative.  These facts indicate that the Plaintiffs did not exercise skill or initiative in such a manner as to suggest that they operated as independent contractors.  *See also Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 191 (S.D.N.Y. 2003) (noting that delivery person needed little skill or initiative to find his way from a store to a customer's residence); *Bonnetts v. Arctic Express, Inc.*, 7 F. Supp. 2d 977, 982 (S.D. Ohio 1998) (if defendant exerted significant control over plaintiff's route selection and other aspects of his job, plaintiff did not use his skills in an independent manner consistent with status as an independent contractor).

    *5) Permanency of the relationship*

    SFEBI points out that the Independent Contractor Agreements were terminable upon twenty-four hours' notice and that the Plaintiffs were free to work for other courier companies during their time with SFEBI.  The Plaintiffs offer no meaningful opposition to this assertion, other than to point out that various individuals worked for SFEBI for more than two years.  These facts indicate that the nature of the Plaintiffs' relationship with SFEBI was that of an independent contractor.  *See Herman*, 161 F.3d at 304 (permanency factor pointed to independent contractor status where drivers worked for defendant for a short time, could work for other courier services, and governing contract did not contain a non-compete clause).

    *6) Whether Plaintiffs' services were integral to SFEBI's business*

    SFEBI does not address this issue.  In any event, it cannot reasonably be disputed that SFEBI operates a courier business, the Plaintiffs were their couriers, and without the Plaintiffs'

services, SFEBI would have been unable to perform its business operations.  The Plaintiffs'

services thus were integral to SFEBI's business, indicating an employee-employer relationship.

*See Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 191-92 (S.D.N.Y. 2003)

(where defendant was engaged primarily in business of providing delivery services, and plaintiffs

performed the actual delivery work, plaintiffs' services constituted an integral part of the

defendant's business); *Bonnetts*, 7 F. Supp. at 985.

     C. The "Circumstances of the Whole Activity"

     Ultimately, the Court must determine whether the Plaintiffs were dependent upon SFEBI.

The "economic dependence" at issue "is dependence on that job for that income to be continued

and not necessarily for complete sustenance." *Halferty*, 821 F.2d at 267.  Further, "the proper test

of economic dependence mandates consideration of all the factors, and in light of such

consideration examines whether the workers are dependent on a particular business or organization

for their continued employment in that line of business." *Id*. at 267-68 (internal citation and

quotation omitted); *see also Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311, 324 (S.D.N.Y.

2001) ("[T]he ultimate concern is whether, as a matter of economic reality, the workers depend

upon someone else's business for the opportunity to render service or are in the business for

themselves.") (internal citation and quotation omitted).

     A review of the factors, and the evidence pertinent to each, suggests that, notwithstanding

the contractual identification of the Plaintiffs as independent contractors and SFEBI's attempts to

structure the relationship accordingly, the Plaintiffs actually served in an employee relationship

with SFEBI.  It does not appear that the Plaintiffs were so independent of SFEBI as to be in

business for themselves and instead it appears that the Plaintiffs depended on SFEBI for their

employment in the courier business.  However, some factors appear to weigh in favor of SFEBI's

assertion that the Plaintiffs were independent contractors.  At this point, however, the Court cannot

make a final determination on several of the "dependence" factors, and there are enough disputed

factual issues to prevent the Court from making a conclusive ruling at this time as to the nature of

the Plaintiffs' relationship with SFEBI.

**IV.      Conclusion**

        For the reasons stated herein, the Court finds that there are disputed issues of fact to be

decided, and therefore summary judgment is not appropriate.  Accordingly, it is

        **ORDERED THAT** the Defendant, SFEBI's Motion for Summary Judgment (Doc. 37) is

DENIED.

        **DONE** and **ORDERED** in Chambers, Orlando, Florida on March 8, 2006.

                                                GREGORY A. PRESNELL
                                                UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party